A. T. BOWERY, Appellant, v. WABASH RAILWAY COMPANY, Appellee.

RAILROADS: Negligence — Sufficiency of Evidence. Record reviewed, and held insufficient to establish any of the grounds of negligence alleged against a railway company by one engaged with his team in cutting weeds upon the right of way.

EVIDENCE: Positive and Negative Testimony. Positive testimony that the statutory bell and whistle signals were given at a railway crossing, met by testimony that such signals were not heard by those *not in a position and mental attitude to have heard them, had they been given,* presents no conflict of evidence, and, consequently, no jury question.

EVIDENCE: Experiments. Experiments made under circumstances and conditions materially different from those existing at the time at issue have no probative force. So held as to experiments which were intended to show how far one on a railway track might be seen by an approaching train.

*Appeal from Des Moines Municipal Court.—J. E.*
MEYER, Judge.

JANUARY 23, 1919.

ACTION to recover damages for injury to property, caused by a collision with a train. Opinion states the facts. Directed verdict for the defendant in the court below. Plaintiff appeals.—*Affirmed.*

*John L. Gillespie,* for appellant.

*Miller & Wallingford,* for appellee.

GAYNOR, J.—Plaintiff claims that, on or about the first of September, 1915, he was employed by the defendant company to cut weeds on its right of way, in the cutting of which weeds he was required to use a mower, drawn by a team of horses; that his employment came through defendant's section foreman; that on said date, he was so engaged; and that, while he was driving his team easterly on the tracks, with his mower astride the south rail of the track, a train, owned and operated by the defendant, ran into and struck the mower and team, demolished the mower, and seriously injured the team; that, before and at the time he was struck, he was in the act of driving the team that pulled the mower that cut the grass growing immediately south of the south rail; that, to cut this grass, it was necessary that he get upon the track. The train that struck him was an east-bound freight train moving in the same direction that he was.

1. RAILROADS: negligence: sufficiency of evidence.

The acts, or omissions to act, which he says constitute the negligence of which he complains, are specifically stated in his petition as follows:

(1) In running the train at a high rate of speed, in view of the fact that they knew, or should have known, that the plaintiff was on the right of way, mowing the weeds.

(2) In failing to have the engine and train under reasonable or proper control, in view of that circumstance.

(3) In failing to give a signal of warning of the approach of the train, a reasonable distance from the place where the plaintiff was mowing at that time.

(4) In failing to keep a reasonable lookout on the track and right of way, ahead of the engine.

(5) In negligently handling and operating the train at said time and place, in view of the circumstances then existing.

(6) In failing to discover plaintiff's whereabouts, and thereafter failing to properly handle the train or apply the brakes, and in failing to stop the engine before it struck plaintiff's property.

The plaintiff says that the negligence of the operators of said engine and train, in one or more of the particulars set out, was the proximate cause of the accident and resulting damages to the plaintiff.

Negligence is the doing of some act, or the omission to do some act, which it was the duty of the party charged not to do or not to omit to do. The acts or omissions to act charged in the petition are the only acts or omissions to act that can be considered in determining the liability of the defendant. *Wirstlin v. Chicago, M. & St. P. R. Co.,* 124 Iowa 170. It will be noted that all the acts, or omissions to act, are acts or omissions to act on the part of those in charge of the train. If negligence is to be found upon which liability can be predicated, it must be found either in the fact that this train crew did something which a reasonably prudent person would not do, under like circumstances, and which it was its duty not to do, or that the defendant's crew, in charge of the engine, omitted to do something which it was its duty to do, and which a reasonably prudent person would not have omitted to do, under like circumstances; and it must be found that the doing, or omission to do, was the proximate cause of the injury complained of.

The question that confronts us now is: Was the evi-
dence such that men of ordinary intelligence, assuming
them to be reasonable men and honest searchers after the
truth, could differ as to the guilt of the defendant, either
in omission or commission, in respect to the matters
charged,—could reasonable men honestly differ as to the
sufficiency of the proof to establish the ultimate fact of
negligence in manner and form as charged? To justify
the court's action in directing a verdict against the plain-
tiff, the evidence on the ultimate fact of negligence must
so fail, in its probative force, that honest minds, searching
for the truth, could honestly reach no other conclusion than
that reached by the court. It seems to have been the thought
of the court that the record did so fail in its proof.

This brings us to a consideration of the evidence.

The first witness called for the plaintiff was the engineer
in charge of the train. He testified that he approached the
place where the plaintiff was, on a curve in the cut; that,
on the banks of the cut, the weeds were growing so high
that he could not see beyond them; that the banks of the
cut and the weeds on the banks shut off his view, as he
approached the place where he collided with plaintiff's prop-
erty; that he was at all times on the watch, and looking
straight ahead, but did not discover the plaintiff and his
peril until he was within 200 feet of the plaintiff, because
of the curve in the track, the banks of the cut, and the
weeds growing on the banks; that, as soon as he saw plain-
tiff, he rang the bell and blew the whistle, set the brakes
and shut off the engine, put on the emergency and the re-
verse,—and that was all he could do; that, when he first
saw the plaintiff, the plaintiff was driving down the track
ahead of him; that he stopped the train within 230 or 240
feet, after discovering the plaintiff. He further testified
that he blew the whistle at a grade crossing to the west,
giving the usual signal as he approached the crossing. This

grade crossing was a half or a quarter of a mile west of where the accident occurred.

The next witness was the conductor. His testimony was to the effect that he was in the engineer's cab, and standing directly behind the engineer, as they passed through the cut, looking straight ahead; that the train was within 200 feet of the mower when he first saw it; that the whistle was blown and the brakes set; that the track through the cut curved to the left; that the engineer was sitting down, looking straight ahead; that he was standing right behind him, looking over his head; that plaintiff was driving down the track, astride the rails; that he did not know the plaintiff was there before he saw him; that the banks of the cut and the weeds growing on the banks were so high that one could not see beyond them; and that they were between the plaintiff and the approaching train.

The fireman testified that he was also in the cab, and looking ahead; that, when he first saw the plaintiff, the engine was within 200 feet of where plaintiff then was. He corroborates the other witnesses as to the efforts made to stop the train, and as to the signals given.

Plaintiff, called in his own behalf, testified that the curve in the track where the accident happened was to the left; that the track makes a curve, which takes it in an easterly direction; that the top of the bank, or the top of the cut, was about 6 feet; that the weeds had not been cut on the north side of the track, except for a distance of about 50 yards immediately back of where he was at the time he was injured. He testified:

"At the time I met with the accident, I was driving east on the right of way, with one wheel in between the tracks, and the other one on the side of the tracks. The train came from behind, from the west. The first thing I knew, a whistle sounded, real sharp. I looked around; I saw the train coming through the cut. This curve runs

practically all the way through the cut. I wasn't quite in the middle of the cut. The train was 150 feet from me when I first saw it. A wagon road crosses the track, a half or a quarter of a mile west of the place of the accident. I had been cutting weeds for some time before the accident. The section assigned to me to cut was about 6 miles long. Trains frequently passed, while I was cutting on the right of way. They slowed up, but no train stopped. They just checked up a little. They wouldn't slow up if I was not on the track."

He said he had seen three hours go by without a train, and then had seen three trains go by in less than an hour. He further testified that he was on the watch for approaching trains; that, when he discussed with the foreman the danger of going upon the track to cut the weeds, the foreman said he recognized the danger, but that he would speak to the train crews, and have them keep a lookout for him. The record discloses, however, that this train crew knew nothing about the fact that he was engaged in working upon the right of way, or was liable to be upon the track.

Plaintiff further testifies that he was on the watch for trains; that he did not hear the whistle or the signal given for the west grade crossing; that he did not hear any signal until the train was within 150 feet of him; that he immediately looked back, saw the train, but was unable to get his property off the track before he was struck.

It happened that, during the time immediately preceding the accident, the plaintiff was running his mower in gear over the ties, engaged in mowing the grass as far out on the south side of the track as his sickle would extend.

That he did not hear the sound of the whistle, under the circumstances, is without probative force even tending to negative the fact that the signal was given, or to estab-

lish the fact affirmatively that the signals
were not given. He had shown by three wit-
nesses, who were in a position to know
whether signals were given, that they were,
in fact, given. The mere fact that he did not hear them,
under these circumstances, does not negative the positive
testimony that these things actually occurred.

*2. Evidence: positive and negative testimony.*

It will be noted from plaintiff's petition that he predi-
cates liability on the part of the defendant on the doing, or
the omission to do, certain things:

(1) That the train was run at a high and dangerous
rate of speed. There is no evidence of the speed at which
this train was run.

(2) That defendant did not have the engine under
proper control. There is no evidence of this. The engineer
was at his post, and, so far as this record shows, the engine
in perfect order, all the appliances were in working order,
and were used to stop the train.

(3) That a reasonable lookout was not kept up by those
in charge of the engine. There is no evidence in the record
that those in charge of the train did not keep a reasonable
lookout ahead for any obstructions on the track.

(4) That the engineer failed to exercise reasonable care
to stop the train after he discovered plaintiff and his peril.
There is no evidence in this record that the train could be
stopped any sooner than it was stopped after discovering
the plaintiff's peril.

(5) That no signals of warning were given. The evi-
dence on this point is that signals were given.

To meet the difficulties of the situation, as presented
by the record up to this point, the plaintiff further testi-
fied in his own behalf, corroborated by another, as follows:

"I made a special trip down there, the other day, to
look at the cut and see the conditions. I took Mr. Bishop
with me, and we made observations or measurements with

reference as to how far you could see from
the point of the accident back towards the
northwest.   We had a little boy, nine years
of age, of ordinary height, stand where the mower was,
and then we went on northwest for a distance of 21 rails,
and we could see the boy.   The boy was standing just
where the mower was, *just south of the edge of the drainage
there,* and his feet were about even with the tops of the ties.
The rails were 30 feet in length, and we could see the boy
a little farther than 21 rails.   The cut slopes down to a
level with the right of way, about 40 yards northwest of
the place of the accident."

**3. EVIDENCE: experiments.**

Bishop, who was with the plaintiff, and who was called
by the plaintiff as witness, testified:

"The little boy was placed on the *south side of the drain-
age,* 3 or 4 feet south of the track, so his feet were about
level with the top of the ties.   Plaintiff and I then walked
up the track, and went as far as we could see him, which
was 21 rails.   The point of the accident was about the center
of the cut.   From the point of the accident in each direc-
tion, the cut decreased gradually, so that, in about 100
yards, the surface of the right of way is about level with
the track.   From about 100 yards northwest of the acci-
dent, where the cut runs out, the track is then on a grade,
and as you go on northwest, it gets to be a pretty good
grade.   This grade extends about half or a quarter of a
mile, and then there is another little cut, and then a grade
again.   At the point of the accident, the cut on the north
side of the track is about 4 feet above the top of the rails.
It is about the same on the south side.   At the point of the
accident, the top of the cut, there is about a 2-foot raise out
to the fence at the north edge of the right of way.   There is
a cut there, through most of the length of that curve.
The ties stick out about a foot beyond the rails, and then
from the end of the tie on down to the drainage covers a

distance of 4 feet; then the cut begins to slope up. In other words, it is about 5½ feet from the rail to where the cut commences. From the point of the accident on northwest, one could see 300 feet before the track straightened out. Had the little boy been standing on the rail, I think I could have seen him."

The accident occurred in September, 1915. The trial was had about October, 1917; so it was nearly two years after the accident that this experiment was made. It is not shown that the conditions were then the same. In fact, in some respects it is shown that the conditions were not the same. It is shown that all the weeds on the north side were cut down at the time this experiment was made. Another significant fact in this experiment is that the boy was placed south of the track, instead of on the track between the rails, and that the boy was placed at a point some distance south of where the plaintiff was at the time of the accident. Without this testimony, there is positive proof introduced by the plaintiff negativing the matters upon which he relies for recovery. Does this proof make it a jury question?

It is true the plaintiff is not bound by the testimony of the train crew. He may show the fact to be other than as testified to by them, and in so doing, lay a foundation for recovery; but he has seen fit to introduce the train crew, and by so doing, has vouched for their credibility, and has taken their statements upon the facts in issue. The testimony given by the plaintiff himself can do no more than inferentially show a state of facts other and different from that which is testified to by the train crew, and it was intended, inferentially, to establish a state of facts other and different from that testified to by the train crew. Does it do so? The testimony of the train crew is that the signals were given. The testimony of the plaintiff is that he did not hear the signals. The conditions that attended plain-

tiff at the time leave both statements proven: First, that the signals were given; and second, that he did not hear them. That he did not hear them does not, under the circumstances that attended them, even tend to negative the fact that they were given. The second proposition which the plaintiff seeks inferentially to establish is that, because he and his friend visited the place some time afterwards, under changed conditions, and were able to see, for 600 feet, a boy standing at a point south of the track, and not where the plaintiff was, the train crew, if diligently watching, as it was its duty to do, should have seen, and therefore did see, plaintiff for 600 feet before the contact, and, having been able to stop the train in 240 feet, as they did, it follows that they could, if they had exercised diligence, have seen the plaintiff in time to have stopped the train, in the exercise of reasonable diligence, after discovering the plaintiff and his peril. To make the inference justifiable, the conditions must be the same as that which attended the engineer at the time. This is not shown to be true,—in fact, is shown not to be true; and, therefore, the inference fails. We think the record fails to establish the plaintiff's claim, and as to this conclusion, reasonable minds could not differ, and the court was right.

We do not, therefore, enter upon a discussion of whether the plaintiff was guilty of contributory negligence, but we have to say this: that, if the plaintiff's testimony has probative force on the issues tendered, he was watching and listening for approaching trains, knew and appreciated the peril of his situation; knew that he was in a cut; knew that the view of the approaching engine was, to some extent obscured; knew that this train could have been seen for 600 feet before it reached him; and yet he did not discover its approach until it was within 150 feet of him, and at a time when it was too late for him to extricate himself from his situation.

Upon the whole record, we think the case must be affirmed, and it is—*Affirmed*.

LADD, C. J., PRESTON and STEVENS, JJ., concur.